# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

BONNIE MARTINEZ, legal guardian and
mother of STEPHANIE MARTINEZ, a
minor,

          **Plaintiff,**

-vs-
                              **Case No.  6:04-cv-1819-Orl-18JGG**

PALM BAY POLICE DEPARTMENT,
CITY OF PALM BAY, FLORIDA,
CASSANDRA WORONKA,
F. WALTERS,

          **Defendants.**

---

# ORDER

THIS CAUSE comes before the Court upon the Motions for Summary Judgment by

Palm Bay Police Department and City of Palm Bay. Florida (Doc. 38. filed April 14, 2006), and

Cassandra Woronka (''Woronka'') and F. Walters ("Walters") (Doc. 41, filed April 17, 2006),

to which Plaintiff Bonnie Martinez responded in opposition (Doc. 50, filed May 30, 2006 &

Doc. 51, filed June 2, 2006). The Court grants the Motions for Summary Judgment.

## I. PLAINTIFF'S RESPONSE & AFFIDAVIT ARE STRICKEN, SUMMARY JUDGMENT IS GRANTED

Plaintiff requested a fifteen day time extension to respond to the Motions for Summary

Judgment. (Doc. 45.) The Magistrate granted the time extension on May 12, 2006 (Doc. 46),

which gave Plaintiff until May 30 to file its responses.[1] The Magistrate warned that no further

time extension would be granted. (Id.) Plaintiff timely filed its Response to the City of Palm

---

[1]This calculation takes into account Memorial Day Weekend (May 27-29).

Bay and Palm Bay Police Department. (Doc. 50.) Plaintiff, however, filed a Response to Woronka and Walters with accompanying affidavit (Doc. 51) on June 2nd, which was untimely. The Response to Woronka and Walters and accompanying affidavit are accordingly stricken.

The Court is therefore left with Plaintiff's initial response (Doc. 50), which consists of three paragraphs and asserts only that the Motion for Summary by the City of Palm Bay and Palm Bay Police Department fails because the Court struck the later's Statements of Undisputed Facts. Plaintiff's argument fails. The Court struck Defendants' Statements of Undisputed Facts because they amounted to additional argument proscribed the Case Management and Scheduling Order and by Local Rule 3.01(c). The Court did not strike Defendants' memoranda of law or the numerous exhibits filed therewith. Thus, Plaintiff fails to respond to the merits of Defendants' summary judgment arguments. After a complete review of the entirety of the record, the Defendants' Motions for Summary Judgement are well-founded and are accordingly granted.

Nonetheless, it bears mentioning that even if the Court had not stricken Plaintiff's response to Woronka and Walters and accompanying affidavit (Doc. 51), the Motions for Summary Judgment would still have been granted. In the interest of thoroughness, the Court now addresses Plaintiff's untimely response and accompanying affidavit.

## II. BACKGROUND

During the morning of October 28, 2002, Stephanie Martinez ("Stephanie"), a fifteen-year-old girl, informed her psychiatrist (Dr. Mosley) that she was pregnant. (S.Martinez Dep. 52.) Dr. Mosley determined that Stephanie, in her fifth week of pregnancy, required a change

in her current medications due to concern of adverse effects on the pregnancy. (S.Martinez Aff. 1; S.Martinez Dep. 34, 52; Mosley Dep. 12.)   Knowing that Stephanie's mother, Bonnie Martinez ("Bonnie"), would be asking about the medication change, Dr. Mosley requested Stephanie to bring Bonnie to the office for a meeting—the purpose of which was to lay the groundwork for Stephanie to tell her mother about the pregnancy. (S.Martinez Dep. 53; Mosley Dep. 12.) Stephanie "did not like" the idea of the meeting because she "wasn't ready" for her mother to know. (S.Martinez Dep. 53.)

At the meeting, Dr. Mosley first met with Stephanie alone and told her that she should tell Bonnie about the pregnancy. (S.Martinez Dep. 55.) Stephanie "didn't say no, but [she] didn't say yes either." (Id.) Dr. Mosley brought Bonnie into the room, at which point Stephanie was "crying heavily." (S.Martinez Dep. 55; B.Martinez Dep. 48.)  Bonnie asked Stephanie "what was wrong," and Stephanie did not respond. (S.Martinez Dep. at 55.) Bonnie said "your pregnant," and Stephanie, again, did not respond. (Id.) Stephanie "didn't want [Bonnie] to know" and began "yelling at the doctor" and "cry[ing] hysterically." (Id. at 55, 159-60; Compl. ¶ 6.) Stephanie walked "quickly" out of the room feeling "extremely upset." (Id. at 57, 59; B.Martinez Dep. 49.) Stephanie left the office and crossed the street in the direction of a fire department. (S.Martinez Dep. 55-56.)

When Bonnie left the room to follow her daughter, Stephanie was "already out of sight." (B. Martinez Dep. 50.) After searching inside the office and looking down both streets adjacent to the office, Bonnie got into her car to search for Stephanie. (Id. at 51.)

Dr. Mosley called 911 and requested the police. (Mosley Dep. 14, 18, 63.) Dr. Mosley recalled saying that he was "worried about [Stephanie's] safety" and that she "needed . . . to go into evaluation at the hospital." (Id. at 18.) Dr. Mosley also recalled stating, "[s]hall I Baker Act? . . . I'll go ahead and give you the Baker Act," to which he received the answer: "No, that's not necessary. We'll go ahead and do that." (Id.)

Bonnie found Stephanie standing behind the fire station. (B.Martinez Dep. 13.) Stephanie was crying and standing with some firemen. (Id.) Bonnie encouraged Stephanie to get in the car, but Stephanie refused. (S.Martinez Dep. 65; B.Martinez Dep. 55.) Between five and twenty-five minutes after Bonnie's arrival at the fire station, Palm Bay police officers Woronka and Walters (collectively, "the Officers") arrived.[2]

The Officers were dispatched to respond to a suicide threat in progress. (Woronka Dep. 14, 69; Walters Dep. 12.) The dispatch officer informed the Officers that a "[d]istraught juvenile female had run out of a doctor's office"; that the "[d]octor was worried of suicide threats"; that the female had a history as a suicide threat; and that the female was "behind Station 90, the fire station." (Woronka Dep. 14.) When the Officers first came upon Stephanie, Officer Woronka perceived Stephanie to be standing appoximately ten feet[3] away from a canal.[4]

---

[2]Stephanie says that the police arrived five minutes after Bonnie arrived. (S.Martinez Dep. 65.) Bonnie states that the police came twenty to twenty-five minutes after she arrived. (B.Martinez Dep. 55.)

[3]Stephanie states that she was ten to fifteen feet away from the canal. (S.Martinez Dep. 76.)

[4]Stephanie and Bonnie refer to a "canal" in their depositions. (S.Martinez Dep. 60; B.Martinez Dep. 67.) At other points in the Record the canal is referred to as a "drainage ditch." (Doc. 40-1 at 8.)

(Woronka Dep. 18.)  The canal had a five to ten foot dropoff,[5] contained approximately three

feet of water, and the ground before the canal was "uneven."  (B.Martinez Dep. 65; Walters

Dep. 45.)  The surface of the ground Stephanie was standing on "was not flat like concrete"; it

was a combination of "grass and dirt," and had "ant piles around." (S.Martinez Dep. at 76-77.)

Stephanie states that the Officers approached her and asked questions such as "what's

going on?," "are you okay?," and "are you in trouble?" (S.Martinez Dep. 66.) Stephanie asked

the Officers why they were there, to which the Officers said they were "just here to help." (Id.)

The Officers told Stephanie to get into the car with her mother.  (Id.)  Stephanie told the

officer's "not now" or "not at this time." (Id. at 66, 68.)  The Officers continued to get closer

to Stephanie, and Stephanie felt crowded. (Id. at 66-67.) Stephanie began to repeatedly scream,

"get away from me," continued to "hysterically cry[]," and placed her hands over her ears.  (Id.

at 67, 69, 160, 163; Woronka Dep. 18; Walters Dep. 19-20.) Stephanie took "little steps" away

from the Officers, and the Officers walked around to be in front of her while they continued to

talk to her.  (S.Martinez Dep. 67-69.)  This exchange between Stephanie and the Officers

continued over a period of five minutes. (S.Martinez Dep. at 69.)

At a certain point, Stephanie "turned [her] back to [the Officers]" (S.Martinez Dep. 79),

so that she was facing in the direction of the canal.  (Id. at 78-80.)  Upon making that turn,

Woronka closed the gap between herself and Stephanie and took hold of both of Stephanie's

arms. (Id. at 81.)  Woronka placed Stephanie's left arm behind Stephanie's back, which caused

---

[5]Bonnie states that the canal had a five to ten foot dropoff. Walters estimated a fifteen foot dropoff (Walters Dep. 45), and Woronka estimated an eight to ten foot dropoff. (Woronka Dep. 118.)

Stephanie "excruciating pain." (Id. at 81-82, 85.)[6]   Stephanie "was struggling with [the

Officers] when they were putting her arms behind her." (B.Martinez Dep. 70.)   Stephanie

"screamed" to the Officers that she was pregnant. (S.Martinez Dep. 81, 83.)[7]   Stephanie told

the Officers that her "shoulder was injured." (S.Martinez Aff. 2.)[8]

The Officers "forced" Stephanie down to her knees, and then "leaned" Stephanie face-

down onto the ground. (S.Martinez Dep. 83.)   Woronka then put her right knee into the middle

of Stephanie's lower back, in an area that was below the waistline. (Id. at 81-82, 84-86.)   The

weight of the knee "was barely making [Stephanie] stay" and she did not suffer injury from it.

(Id. at 86.)   Stephanie attempted to get her legs up, causing Walters to sit on Stephanie's legs.

(Id. at 84.)   Stephanie was kicking her legs. (Id. at 85.)   While the Officers were handcuffing

Stephanie, she told them that "the handcuffs hurt [her] shoulder and that [she] had recently had

surgery. (S.Martinez Aff. 2.)[9]   Bonnie stepped forward to within five feet and told the officers

that they were hurting Stephanie and that Stephanie had received shoulder surgery. (B.Martinez

---

[6]Stephanie's deposition makes it clear that Woronka placed Stephanie's arm behind her back before putting her down onto the ground. (S.Martinez Dep. at 85.)

[7]Woronka does not recall Stephanie telling her of the pregnancy. (Woronka Dep. 29, 102.) Walters states that he did not know of the pregnancy at any point during the Officers' seizure of Stephanie. (Walters Dep. 51.)

[8]The Officers dispute that Stephanie warned them about her shoulder injury at any time during the seizure. (Walters Dep. 27-28; Woronka Dep. 47-48, 103.)

[9]The Officers dispute that Stephanie warned them about her shoulder surgery at any time during the seizure. (Walters Dep. 27-28; Woronka Dep. 47-48, 103.) Woronka does not recall Stephanie stating that her shoulder hurt. (Woronka Dep. 92-93.)

Dep. 103. 111.)[10] During the time that Stephanie was on the ground, Stephanie was struggling "off-and-on." (Id. at 72.)

After securing Stephanie, the Officers placed Stephanie in a seated position, where Stephanie's knees were on the ground and she was sitting on the back of her lower legs. (S.Martinez Dep. 88, 90; B.Martinez Dep. 73.) Woronka dropped a key and bent down to pick the key up at about the same time as Stephanie pulled her right hand out of the handcuff and placed her right hand in her lap. (S.Martinez Dep. 90-94.)[11] Stephanie told the officers that she was "out of the handcuffs." (Id. at 91.) The officers again put Stephanie face-down on the ground. although not as forcefully as the first time. (Id. at 94.) Stephanie began struggling again. (B.Martinez Dep. 78.) The Officers re-cuffed Stephanie. this time placing both hands behind her back with palms facing outward in one cuff, with the other cuff attached to a beltloop. (S.Martinez Dep. 92.) Woronka told Stephanie that she was being Baker Acted. (Id. at 96.) Stephanie was placed in a patrol car and taken to the Palm Bay Community Hospital emergency room where her left shoulder was examined. (Id. at 97-101.) Following the hospital examination, Stephanie was taken to Circles of Care psychiatric facility. (Id. at 101.)

---

[10]Woronka states that Bonnie was screaming at them during the seizure, but she does not recall "what Bonnie was screaming." (Woronka Dep. 60, 103.) Walters does not recall any interaction with Bonnie during the seizure. (Walters Dep. 56-57.)

[11]The Officers perceived Stephanie as swinging her right hand around at Officer Walters' face with a loose handcuff, which Walters had to block. (Woronka Dep. 56-58: Walters Dep. 52.) Stephanie states that she did not swing her right hand at the Officers. (S.Martinez Dep. 92.)

## III. SUMMARY JUDGMENT STANDARD

A court will grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case under the applicable substantive law. Disputed issues of material fact preclude the entry of summary judgment, but factual disputes that are irrelevant or unnecessary do not. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The moving party may rely solely on its pleadings to satisfy its burden. Celotex, 477 U.S. at 323-24. A non-moving party bearing the burden of proof, however, must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate specific facts indicating there is a genuine issue for trial. Id. at 324. If the evidence offered by the non-moving party is merely colorable, or is not significantly probative, the Court may grant summary judgment. Anderson, 477 U.S. at 249-50. Similarly, summary judgment is mandated against a party who fails to prove an essential element of its case. Celotex, 477 U.S. at 322.

# VI. DISCUSSION

## A. Qualified Immunity

The Officers raise the affirmative defense of qualified immunity. The purpose of qualified immunity is to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted) (internal quotations omitted). Qualified immunity will apply "unless application of the standard would inevitably lead every reasonable officer in [the position of the defendant officer] to conclude the force was unlawful." Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (alteration in original) (internal quotations omitted).

To be eligible for qualified immunity, a government official must initially demonstrate that he was performing a "discretionary function" at the time of the alleged constitutional right violation. Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). If the government official meets this requirement, the burden shifts to the plaintiff to demonstrate that the official is not entitled to qualified immunity. Id. The plaintiff must show: "(1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was 'clearly established' at the time he did it." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

A government official is engaged in a discretionary function if the acts he undertook "are of a type that fell within the employee's job responsibilities." Crosby, 394 F.3d at 1332

(internal quotations omitted).  Because the Officers were responding to a call of suicide threat in progress and attempting to engage a potentially suicidal subject, they were clearly performing an act that fell within their job responsibilities.  See Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005).

Plaintiff, therefore, carries the burden of showing that a constitutional violation occurred, and that the violated constitutional right was clearly established at the time of the incident.

### 1. *False Arrest Claim Against the Officers*

#### a. *Constitutional Violation*

Plaintiff asserts a Section 1983[12] false arrest claim against Woronka and Walters in their individual capacities.  (Doc. 2 ¶¶ 20-25.)  "An arrest without probable cause is unconstitutional."  Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999).  However, for purposes of qualified immunity, a constitutional violation does not occur unless the officer made an arrest without *arguable* probable cause.  Id.  The test for determining arguable probable cause is "whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law."  Gold v. City of Miami, 121 F.3d 1442, 1445 (11th Cir. 1997) (internal quotations omitted).

---

[12]Section 1983 is not a source of substantive rights; rather, it provides a conduit by which aggrieved parties may recover against those who have violated their rights under federal law.  42 U.S.C. § 1983; see also Skinner v. City of Miami, 62 F.3d 344, 347 (11th Cir. 1995).  To recover under Section 1983, the plaintiff must prove that the Officers acted under color of state law to deprive the plaintiff of a right secured either under the Constitution or under federal law.  Burton v. City of Belle Glade, 178 F.3d 1175, 1188 (11th Cir. 1999).

Under Florida's Baker Act, a police officer "shall take a person who appears to meet the criteria for involuntary examination into custody and deliver the person or have him or her delivered to the nearest receiving facility for examination." Fla. Stat. § 394.463 (2)(a)(2)(2002).[13] The Baker Act provides the following criteria:

> (1) Criteria.—A person may be taken to a receiving facility for involuntary examination if there is reason to believe that he or she is mentally ill and because of his or her mental illness:
> (a)1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or
> 2. The person is unable to determine for himself or herself whether examination is necessary; and
> (b)1. Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or
> 2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.

Fla. Stat. § 394.463(1)(2002).

Plaintiff's primary argument for false arrest is that Stephanie did not act "in a manner that would lead officers to believe that she [was] going to hurt herself." (Doc. 51-1 at 6-7.) The Court disagrees. The following facts are undisputed: Stephanie, crying heavily, fled Dr. Mosley's office after Bonnie learned of Stephanie's pregnancy; Dr. Mosley called 911 for police support because he was concerned that Stephanie might harm herself; the Officers received a call for suicide threat in progress concerning a juvenile who had history as a suicide threat; the

---

[13]The version of the Baker Act used in this Order was in effect on November 28, 2002. Since that time, the Baker Act has been amended.

Officers approached Stephanie while she was standing on uneven terrain and in close vicinity to a canal that had a five to ten foot dropoff; Stephanie was crying, screaming, and placing her hands on her ears while the Officers spent approximately five minutes attempting to console her; and Stephanie made a sudden movement in the direction of the canal immediately before the Officers seized her.

Under these circumstances, it was reasonable to believe that Stephanie posed an immediate threat of harm to herself. More specifically, it was reasonable for the Officers to believe that: (a) Stephanie was unable to determine for herself whether mental examination was necessary; and (b) there was a substantial likelihood that without care or treatment Stephanie would cause serious bodily harm to herself or others in the near future. Fla. Stat. § 394.462. Thus, the Officers *could* have reasonably believed they had probable cause to seize Stephanie pursuant to Florida's Baker Act.[14] It follows that the Officers receive qualified immunity with respect to the claim of false arrest.

### b. Clearly Established Constitutional Violation

The Court pauses only to mention that even if the Officers' seizure of Stephanie somehow constituted a false arrest, Plaintiff fails to carry the burden of showing that the

---

[14]Although Defendants do not raise the argument, it also bears mentioning that the Officers may have had probable cause to arrest Stephanie for resisting an officer without violence. See Fla. Stat. § 843.02 ("Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering of doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree . . . ."). It is irrelevant that the Officers may not have subjectively relied upon this statute when seizing Stephanie. See Lee v. Ferraro, 284 F.3d 1188, 1195-96 (citing cases). Here, when the Officers requested Stephanie to leave a threatening area (canal and uneven ground) and to proceed to the safety of her mother's vehicle, Stephanie refused. (S.Martinez Dep. 66, 68.) A person's refusal to leave an area where police officers are attempting to carry out their duty of investigating "a suspected domestic disturbance and Baker Act situation" may give rise to probable cause. Sullivan v. City of Pembroke Pines, 161 Fed. Appx. 906, 909 (11th Cir. 2006).

violated constitutional right was clearly established at the time of the incident. Plaintiff does not address the issue. (Doc. 51-1 at 6-7.) See Mercado v. City of Orlando, 407 F.3d 1152, 1159 (explaining that a plaintiff must: (1) cite to similar case law that would have provided notice to the police: (2) show a broader. clearly established principle; or (3) show that the alleged conduct "so obviously violates [the] constitution that prior case law is unnecessary").

### 2. *Excessive Force Claim Against the Officers*

#### a. *Constitutional Violation*

Plaintiff asserts a Section 1983 excessive force claim against the Officers. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis omitted). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain. and rapidly evolving—about the amount of force that is necessary in a particular situation." Draper, 369 F.3d at 1277-78 (internal quotations omitted). To determine whether force was reasonable, courts examine "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (internal quotations omitted) (footnote omitted). The Court addresses each of these factors in turn.

*i. The Need for the Application of Force*

In determining the need for the application of force. a court must consider the following three factors ("Graham factors"): "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). The first Graham factor does not fit nicely into the circumstances of this case because there was not necessarily a specific crime at issue.[15] This does not, however, undermine the fact that police officers must take persons into custody when they appear to fulfill the Baker Act criteria. Fla. Stat. § 394.463(2)(a)(2) ("A law enforcement officer *shall* take a person who *appears* to meet the criteria for involuntary examination into custody.") (emphasis added). Further, "Florida law recognizes 'a compelling interest in preventing suicide.'" Mercado, 407 F.3d at 1157 (quoting Kirscher v. McIver, 697 So.2d 97, 103 (Fla. 1997)). Thus, a reasonably perceived imminent threat of suicide is obviously a matter of life and death, and therefore a serious matter calling for immediate action on behalf of police officers called to the scene.

With respect to the second Graham factor, the circumstances reveal that Stephanie posed a real and immediate threat to herself. The Officers were aware of Dr. Mosley's concern for Stephanie's safety and were responding to a suicide threat in progress of a juvenile who had history as a suicide threat. This awareness, coupled with Stephanie's

---

[15]Florida does not recognize attempted suicide as a crime. Krischer v. McIver, 697 So.2d 97, 100 (Fla. 1997).

behavior and her sudden turn in the direction of a five to ten foot deep canal, constituted an immediate threat to Stephanie's safety. See Mercado, 407 F.3d at 1157 (allotting weight to the fact that plaintiff posed a threat to himself, acknowledging that Florida law recognizes a compelling interest in preventing suicide).

As for the third Graham factor, by making a sudden turn—positioning her back to the Officers and facing in the direction of the canal—Stephanie took an action that both Officers perceived as flight away from them and towards the canal. (Woronka Dep. 45, 49; Walters Dep. 86.) Both Officers perceived Stephanie as attempting to jump into the canal. (Woronka Dep. 45; Walters Dep. 41.) Based on the circumstances, the perception of flight and threat of imminent injury was not unreasonable. Further, although Stephanie baldly states in her affidavit that "she did not resist arrest" (S.Martinez Aff. 3), her deposition and her mother's deposition tell a somewhat different story. Stephanie testified that after being initially taken down, she attempted to "get her legs up," causing Walters to sit on Stephanie's legs. (Id. at 84.) Stephanie also admits to kicking her legs. (Id. at 85.) Bonnie testifies that Stephanie: "was struggling with [the Officers] when they were putting her arms behind her" (B.Martinez Dep. at 70); was struggling "off-and-on" while on the ground (id. at 72.); and was struggling again when the Officers took her down the second time (id. at 78). The Officers perceived Stephanie as resisting. (Woronka Dep. 29-31, 34-35, 93-94; Walters Dep. 27, 32.) Based on Plaintiff's own account of the facts, the Officers' perception of resistance was not unreasonable.

In summary, it is apparent that there was a definitive need for application of force due to Stephanie causing an imminent threat of safety to her life and the Officers' reasonable perception of resistance.

> ii. *The Relationship Between the Need and Amount of Force Used*

As pointed out in the preceding analysis, it is clear that there was a definitive need for the use of force in seizing Stephanie.  As for whether the amount of force was disproportionately excessive, Plaintiff submits one argument: the Officers' application of handcuffs amounted to an intentional attempt at injuring Stephanie.  (Doc. 51-1 at 8-9.)  For proof of an intent to injure, Plaintiff submits Stephanie's affidavit, which states in pertinent part:

> [T]wo police officers, Walters and Waronka came and also wanted to know what was going on.  Within 30 seconds they asked me if I needed help and I said, "No, leave me alone, and that I was pregnant!"  They then, within less than a minute, grabbed my arms, I told them my shoulder was injured, but they put me down on the ground and then put me in handcuffs very hard.  While they were doing this, I told the officers that the handcuffs hurt my shoulder that I had recently had surgery, *but they only pulled harder.*  I told them that I wasn't in trouble and nothing was wrong.  My left shoulder dislocated as a result of being in the handcuffs.

(S.Martinez Aff. at 2) (emphasis added).

Plaintiff argues that Stephanie's statement, "but they only pulled harder," is an assertion that the Officers intentionally "pulled harder" in response to learning that Stephanie had a shoulder injury.  Viewing the facts in a light most favorable to the Plaintiff, the Court accepts that the Officers "pulled harder" at some time after Stephanie informed the

Officers of her shoulder surgery.[16]   But this fact, by itself, is insufficient to create an issue of

material fact.  The affidavit clearly states that Stephanie's disclosure of shoulder surgery and

the subsequent "pull[ing] harder" occurred during the fastening of handcuffs behind the

back.  The Eleventh Circuit has held that the action of grabbing the arm, twisting it around

to the back, jerking it up high to the shoulder, and handcuffing a person—even as that

person falls to his knees screaming—is "a relatively common and ordinarily accepted non-

excessive way to detain."  Rodriguez v. Farrell, 280 F.3d 1341, 1352 (11th Cir. 2002); see

also Nolin v. Isbell, 207 F.3d 1253, 1254-58 (11th Cir. 2000) (holding that where a police

officer reasonably perceived two boys to be fighting, it was "de minimis" force to grab one

of the boys, a seventeen-year-old, from behind by the shoulder and wrist, throw him against

a van three or four feet away, knee him in the back, push his head against the side of the van,

search his groin area in an uncomfortable manner, and handcuff him.)  Stephanie does not

assert, and Plaintiff submits no evidence, that the pull was any harder than what was

minimally necessary to secure Stephanie in the state that she was in (crying, screaming,

kicking, trying to get her legs up)—this is true especially given the fact that Bonnie attests to

---

[16]Defendants dispute that Stephanie provided warning of her shoulder surgery.  (Walters Dep. 27-28; Woronka Dep. 47-48, 103.)  Although credibility is not at issue at summary judgment, the Court notes that nowhere in Stephanie's deposition does she state that she warned the Officers of her shoulder injury.  Also absent from the deposition is any mention of the Officers "pull[ing] harder" sometime after Stephanie stated that she had received shoulder surgery.

Stephanie struggling with the Officers upon first contact and while on the ground.[17]

(B.Martinez Dep. 72.)

Moreover, nowhere in the affidavit and nowhere in the deposition does Stephanie

identify the "pull[ing] harder" as a cause of her complained of shoulder injury.  Nor does

Plaintiff submit medical evidence of the "pull[ing] harder" being a cause to the injury.

Indeed, Stephanie attributes the cause of her injury to nearly every other component of the

seizure.  At deposition, Stephanie emphasized that Woronka's initial act in pulling the left

arm behind the back was what aggravated the pre-existing injury:

> Stephanie: My arm [was] like in excruciating pain because [of] the way she
> whipped it back.  I was told, you know, after I had my first surgery, if something
> happens to my arm it's going to be messed up.  And just the way that she, you
> know, ripped it behind me and then put me to the ground, and it was like I couldn't
> breathe.
> (S.Martinez Dep. 85.)

Yet elsewhere in the deposition it is clear that the initial take down caused the shoulder to be

"messed up":

> Question: Do you have a recollection as to physically how you were taken to the
> ground?
> Stephanie: *Yes, so much that it messed up my shoulder.*
> Question: Describe for me, then, how you were taken to the ground?
> Stephanie: Well, like I said, she had her hands around my upper arms and her –
> left, grabbed my left hand and put me to the ground.  I remember I went down on

---

[17] According to Bonnie, Stephanie "struggled" with the Officers upon first contact:
Question: [W]hen the police officers first touched Stephanie did she resist or struggle in any way?
. . .
Bonnie: In other words, [Stephanie] did not just stand there and let them take her hands behind her.
Question: What did she do?
Bonnie: I guess you could say *she was struggling with them* when they were putting her arms behind
her.
(B.Martinez Dep. 69-70) (emphasis added).
During the time that Stephanie was on the ground, Stephanie was struggling "off-and-on."  (B.Martinez Dep. 72.)

> my knees first, and then she kind of leaned me toward the ground . . . . And it was
> very forceful . . . so much so that it like knocked the wind out of me when I went
> down.

(S.Martinez Dep. 83) (emphasis added).

Finally, the affidavit attributes the shoulder injury to "being in handcuffs"—not to the

process of handcuffing.

Thus, the spoken warnings of shoulder injury and subsequent "pull[ing] harder" is

insufficient to create a disputed issue of material fact.  In light of Stephanie's unstable state,

the threatening terrain, and the reasonably perceived resistance upon first contact, the Court

finds that the Officers' seizure was within the realm of force necessary to meet the need

presented by the dire circumstance Stephanie had placed herself in.

### iii.  The Extent of the Injury Inflicted

Finally, the Court considers the extent of the injury inflicted.  The Complaint states

that Stephanie suffered a left shoulder injury, which aggravated a pre-existing injury.

(Complaint ¶ 15.)  As a result of the injury at issue here, Stephanie underwent surgery for a

torn rotator cuff in August 2003.  (Doc. 51-1 at 5, S.Martinez Dep. 117-18.)  Stephanie

testified that the shoulder occasionally dislocates while she is at work and that she can

dislocate it at will.  (S.Martinez Dep. 15.)

Two years prior to the incident at issue, Stephanie injured her left shoulder in an ice

skating incident and underwent rotator cuff surgery.  (Doc. 51-1 at 4; S.Martinez Dep. 25-

26; B.Martinez Dep. at 103.)  The injury caused the shoulder to dislocate a "couple of times

everyday" and enabled Stephanie to dislocate the shoulder at will.  (S.Martinez Dep. 98,

176, 183.)  After Stephanie received surgery, the shoulder had repaired to the point it no

longer dislocated. (Id. at 176.) Stephanie's physician warned that if something were to

happen to her arm, "it's going to be messed up." (Id. at 85.) More specifically, Stephanie's

physician gave instructions not to "rough house . . . and play around to the point that her arm

would be pulled back." (B.Martinez Dep. 103-04.)

It is noteworthy that the Officers pulled Stephanie's arm in the exact manner that

Stephanie's physician had previously warned against. Indeed, Bonnie states that the Officers

"were doing the very thing that the doctor said should never ever occur." (B.Martinez Dep.

103.) Despite the fact that Stephanie warned the Officers of a shoulder injury, the Officers

did not know, and could not have known, that Stephanie had a pre-existing condition where

"playing around to the point that her arm would be pulled back" would cause her shoulder to

be re-injured. The blunt knowledge of a shoulder injury cannot be expected to create an

acute awareness of the precise sensitivity that Stephanie possessed. The Eleventh Circuit

has cautioned that "[w]hat would ordinarily be considered reasonable force does not become

excessive force when the force aggravates (however severely) a pre-existing condition the

extent of which was unknown to the officer at the time." Rodriguez, 280 F.3d at 1353.

### iv. The Force Used Did Not Constitute a Constitutional Violation

After considering each of the three factors set forth in Draper and viewing the facts

in a light most favorable to the Plaintiff, the Court concludes that the amount of force used

did not constitute a constitutional violation. In light of Stephanie's immediate threat of

suicide, her sudden turn in the direction of the canal, her reasonably perceived resistance

from the first point of contact, and her pre-existing shoulder condition, the Officers did not

use a disproportionate amount of force in seizing Stephanie pursuant to the Baker Act. The Officers are accordingly entitled to qualified immunity.

### b. Clearly Established Constitutional Violation

The Court pauses to note that even if a constitutional violation could somehow be found, the Plaintiff clearly fails to show a clearly established violation of law. The issue is altogether left unaddressed in the two pages devoted to the excessive force claim. (Doc. 51-1 at 7-9.) See Mercado v. City of Orlando, 407 F.3d 1152, 1159 (explaining that a plaintiff must: (1) cite to similar case law that would have provided notice to the police; (2) show a broader, clearly established principle; or (3) show that the alleged conduct "so obviously violates [the] constitution that prior case law is unnecessary.") It is Plaintiff's burden to show a clearly established constitutional violation—a burden that Plaintiff fails to carry.

## B. State Law Claim of Battery Against the Officers

Under Florida law, a "battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." City of Miami v. Sanders, 672 So.2d 46, 47 (Fla. 3d DCA 1996). "Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" Id. (quoting Fla. Stat. § 776.05(1)(1995)). "[A] presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." Id. For the same reasons provided above, this Court finds that the Officers' use of force was not clearly excessive. The Court accordingly

grants the Motion for Summary Judgment with respect to the claim of battery against the Officers.

## C. Claims Against the Officers in Their Official Capacity

Plaintiff brings suit against the Officers in their official capacities. It is well established, however, that "[f]or liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents." Vineyard v. County of Murray, 990 F.2d 1207, 1210 (11th Cir. 1993) (internal quotations omitted). The Court accordingly grants summary judgment as to the claims against the Officers' in their official capacity.

## D. City of Palm Bay and Palm Bay Police Department

Plaintiff brings suit against the City of Palm Bay and the Palm Bay Police Department.[18] "[M]unicipalities are subject to § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury[.]'" Mercado, 407 F.3d at 1161 (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). Here, Plaintiff submits no evidence of an unconstitutional policy. Plaintiff does no more than allege that the City "owed a duty to supervise or train the officers and to take steps to prevent events such as occurred here." (Compl. ¶ 27.) This bald allegation, without more, is insufficient to

---

[18]The Palm Bay Police Department is not an entity subject to suit. See, e.g., Pierre v. Schlemmer, 932 F. Supp. 278, 279 (M.D. Fla. 1996) ("Bradenton Police Department is a department for the City of Bradenton, who is also a defendant in this suit, and therefore Bradenton Police Department is not a 'person' under 42 U.S.C. § 1983, or Florida law."); Eddy v. City of Miami, 715 F. Supp. 1553, 1556 (S.D. Fla. 1989) ("Where a police department is an integral part of the city government as the vehicle through which the city government fulfills its policing functions, it is not an entity subject to suit.").

survive summary judgment. Mercado, 407 F.3d at 1161 (explaining that for a Monell claim

to survive summary judgment, a plaintiff must: (1) "bring forth *some evidence* of a pattern of

improper training"; (2) "*show* that [the city] was aware of the deficiencies in the program";

and (3) "*show* that this training or failure to train amounted to 'deliberate indifference' on

the part of the [city]") (emphasis added). The Motion for Summary Judgment is accordingly

granted as to claims against the City of Palm Bay and Palm Bay Police Department.

## V. CONCLUSION

The Court accordingly **ORDERS** as follows:

1.  Plaintiff's Response to Defendants Woronka and Walters and Accompanying
    Affidavit (Doc. 51) is **STRICKEN** as untimely;

2.  The Reply (Doc. 52, filed on June 14, 2006) by Defendants City of Palm Bay and
    Palm Bay Police Department is **STRICKEN**. Defendants failed to ask for
    permission to file the Reply pursuant to Local Rule 3.01(b);

3.  Defendants' Motions for Summary Judgment (Docs. 38 & 41) are **GRANTED**;

4.  The Clerk of the court is directed to enter judgment accordingly and **CLOSE THE
    CASE**.

    **DONE** and **ORDERED** in Orlando, Florida on this day of July, 2006.

    **G. KENDALL SHARP**
    SENIOR UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

-23-